UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CORRECTION OFFICERS BENEVOLENT
ASSOCIATION OF ROCKLAND COUNTY;
KATHERINE BRUSO; LYNN HAYES; NELLIE
TRACEY; DOREEN CARDILLO; JENNIFER
COGGINS; AUDREY DICKEY-BAISLEY;
DIEDRE RUSSELL; TYANNE HANSEN-
SERRANO; ERICA BAUER; and OTHERS
SIMILARLY SITUATED,

              Plaintiffs,

          - against -

JAMES F. KRALIK; ROCKLAND COUNTY
OFFICE OF THE SHERIFF; COUNTY OF
ROCKLAND; ALAN J. CROCE, Chairman of the
New York State Commission of Correction; THE
NEW YORK STATE COMMISSION OF
CORRECTION; and THOMAS A. BEILEIN,

             Defendants.

**MEMORANDUM OPINION
& ORDER**

04 Civ. 2199 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

       In this Section 1983 action, the Correction Officers Benevolent Association of

Rockland County (the "Union") and certain Rockland County correction officers allege that a

policy requiring that inmates under "constant supervision" be guarded by correction officers of

the same sex violates the officers' Fourteenth Amendment rights.  Defendants – Rockland

County Sheriff James F. Kralik, the Rockland County Office of the Sheriff, and the County of

Rockland (the "County Defendants"), and the Chairman of the New York State Commission of

Correction Thomas A. Beilein[1] – argue, <u>inter alia</u>, that the policy is constitutionally permissible given the need to safeguard inmates' privacy rights.

All remaining defendants have moved for summary judgment.[2]  For the reasons stated below, Defendants' motions for summary judgment will be granted.

<u>**BACKGROUND**</u>[3]

**I.      THE "CONSTANT SUPERVISION" REGULATION
         AND THE SAME-SEX OBSERVATION POLICY**

The New York State Commission of Correction (the "Commission") is a creature of statute, and is authorized to "promulgate rules and regulations establishing minimum standards for . . . the care, custody, correction, treatment, supervision, [and] discipline [of] . . . all persons confined in correctional facilities," including inmates of the Rockland County Correctional Center ("RCCC").  N.Y. Correction Law §§ 40(3), 45(6).  By statute, the Commission may also "visit[] and inspect correctional facilities . . . and appraise the management . . . with specific attention to matters such as safety, security, health of inmates, sanitary conditions, rehabilitative programs . . . and adherence to laws and regulations governing the rights of inmates."  <u>Id.</u> § 45(3).  Where a prison administrator violates a Commission rule or

---

[1]  In a March 26, 2009 order, all claims against the New York State Commission of Correction were dismissed on Eleventh Amendment grounds, and Defendant Thomas A. Beilein was substituted, in his official capacity, for Defendant Alan J. Croce pursuant to Fed. R. Civ. P. 25(d).  <u>Corr. Officers Benev. Ass'n v. Kralik</u>, 04 Civ. 2199(PGG), 2009 WL 856395, *6, *11 (S.D.N.Y. Mar. 26, 2009).

[2]  Plaintiffs submitted a "Memorandum of Law in Opposition to Defendants['] Motion for Summary Judgment & Cross Motion Declaring Policy Herein Unconstitutional, Thereby Requesting the Discontinuance of Same."  (Dkt. No. 39)  Plaintiffs never filed a notice of motion, however, and accordingly there is no cross-motion before this Court.  <u>See</u> Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion.").

[3]  The facts of this case are set forth in greater detail in <u>Corr. Officers Benev. Ass'n</u>, 2009 WL 856395.

regulation, the Commission may "recommend remedial action, and direct such person to comply with the rule, regulation or law."  Id. § 46(4).  In the event of non-compliance, the Commission is authorized to "apply to the supreme court [of the State of New York] for an order directed to such person requiring compliance."  Id.  The Commission also has the power to close prison facilities that do not comply with its rules or regulations.  See id. § 45(8)(a).

Pursuant to its authority under Correction Law § 45(6), the Commission promulgated Section 7003.3(h) of Title 9, NYCRR, which requires the

> chief administrative officer [of each correctional facility] or the facility physician [to] determine whether a prisoner requires additional supervision based on the prisoner's condition, illness or injury, and  . . . [to] order such supervision if warranted.  Additional supervision may include . . . constant supervision.

9 NYCRR § 7003.3(h).

Section 7003.2(d) defines "constant supervision" as:

> the uninterrupted personal visual observation of prisoners by facility staff responsible for the care and custody of such prisoners without the aid of any electrical or mechanical surveillance devices.  Facility staff shall provide continuous and direct supervision by permanently occupying an established post in close proximity to the prisoners under supervision which shall provide staff with:
>
> (1) a continuous clear view of all prisoners under supervision; and
>
> (2) the ability to immediately and directly intervene in response to situations or behavior observed which threaten the health or safety of prisoners or the good order of the facility.

9 NYCRR § 7003.2(d).

Thus, under Section 7003.2(d), a correction officer guarding an inmate who requires "constant supervision" must continuously, without interruption, and with a "clear view," watch the inmate.  This regulation does not address, however, whether the correction officer conducting the "constant supervision" of the inmate must be of the same gender as the inmate.

Until November 2002, the RCCC assigned correction officers to "constant supervision" duty without regard to their sex.  (County Def. R. 56.1 Stat. ¶ 33)[4]  On November 21, 2002, however, a Commission inspector performing a "cycle evaluation" – to ensure that the RCCC was in compliance with Commission regulations – observed that inmates under constant supervision were being watched by correction officers of the opposite sex.  (Id. ¶¶ 32, 34)  The inspector advised a lieutenant in the Rockland County Sheriff's Office that "the RCCC was violating the Regulation because it was unlawful for members of the opposite gender to conduct constant supervision."  (Id. ¶¶ 35-36)

The RCCC requested a legal opinion from the Commission on this issue, and in a November 22, 2002 letter to the RCCC, the Commission's General Counsel opined that "an officer cannot maintain a continuous clear view of an inmate of the other gender while simultaneously providing the same inmate the privacy rights required. . . . As such, it is the Commission's position that the constant supervision of an inmate must be performed by an officer of the same gender."[5]  (Id. ¶ 44; Dranoff Aff., Ex. R (Nov. 22, 2002 Commission Ltr. to RCCC))

---

[4]  To the extent that this Court relies on facts drawn from the Defendants' Local Rule 56.1 statements, it has done so because Plaintiffs have either not disputed those facts or have not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where Plaintiffs disagree with Defendants' characterizations of the cited evidence, and have presented an evidentiary basis for doing so, the Court relies on Plaintiffs' characterization of the evidence.  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

[5]  The Commission's General Counsel testified that his November 22, 2002 legal opinion was "simply a restatement of numerous legal opinions we had previously issued on this topic to numerous other county jails who had asked us the same question, and it represents an incredibly well-settled body of law that's not in dispute."  (County Def. R. 56.1 Stat. ¶ 45; Dranoff Aff., Ex. E (Donegan Dep.) at 12-13)

In response to the Commission's directive, the County immediately implemented a same-sex constant supervision policy.  (County Def. R. 56.1 Stat. ¶¶ 39-40; Dranoff Aff., Ex. G (Conjura Dep.) at 53)  That policy states:

> 1)      In accordance with New York State Commission of Corrections[,] constant supervision, as defined in the New York State Commission of Corrections Minimum Standards section 7003.2(d), shall be maintained in accordance with established New York State Case Law.

> 2)      Constant Supervision as define[d] in NYS [Commission of Correction Regulation] 7003.2[(d)] is:

> ". . . the uninterrupted personal visual observation of prisoners by facility staff responsible for the care and custody of such prisoner without the aid of an electrical or mechanical surveillance devices.  Facility staff shall provide continuous and direct supervision by permanently occupying an established post in close proximity to the prisoners under supervision which shall provide staff with:

> > (1) a continuous clear view of all prisoners under supervision; and

> > (2) the ability to immediately and directly intervene in response to situations or behavior observed which threaten the health or safety of prisoners or the good order of the facility"

> 3)      New York State Case Law, as explained by the NYS [Commission of Correction], requires the gender of the Officer assigned to a constant supervision post be the same gender as the prisoner being supervised.

> 4)      Constant Supervision posts for this Facility are, but may not be limited to, Suicide Watch and Precautionary Watch.

(Dranoff Aff., Ex. P (County policy))

Assignment of officers to "constant supervision watch" at the RCCC is governed by the following procedures:

> 1)      Any Officer assigned to a constant supervision watch shall be the same gender as the inmate being supervised.

> 2)      In the event there are no non-bid post Officers available[,] the junior most bidded post Officer[] that is the same gender as that of the inmate[] may be tempora[rily] assigned to that constant supervision post.

       3)     In the event that no Officer of the same gender as that [o]f the inmate being supervised [is available], the use of overtime shall be authorized for the purposes of staffing the post with an Officer with the same gender as that of the inmate.

             A)     Officers[] with the same gender as that of the inmate[] shall be canvassed by seniority for volunteers first.

             B)     In the event that there are no volunteer[]s[,] supervisors shall Emergency Order the junior most available Officer who has the least amount of overtime and is the same gender as the inmate.

       (4)     In the event that no Officer[] with the same gender as that of the inmate[] is available[,] the inmate shall be housed in Court Holding until such time as an Officer of the same gender becomes available.  The Constant Supervision of this inmate shall be maintained in the Court Holding Cell.

(Id.)

       During discovery, a lieutenant at the RCCC testified that the RCCC instituted the same-sex policy because "[the Commission] has the power . . . through action in sup[reme] court to force jails to comply with their rules.  And it is at least my interpretation that they would actively enforce gender-specific posting. . . .  So based upon their statutory authority, we just complied with what they had said. . . ."  (Dranoff Aff., Ex. G (Conjura Dep.) at 81)

## II.    <u>THE CHAIRMAN'S MEMORANDUM AND LEGAL OPINION</u>

       On May 10, 2005, the Commission's Chairman issued a "Chairman's Memorandum"[6] and legal opinion to sheriffs, chief administrative officers of correctional facilities, and commissioners of correction confirming "the Commission['s] Policy regarding gender and one-on-one constant supervision posts."  (County Def. R. 56.1 Stat. ¶ 48)  The Memorandum notes that "[e]ach [correctional] facility has been faced with the task of providing

---

[6]  "Chairman's Memoranda are issued when the Commission receives sufficient inquiries reflecting a lack of clarity by facilities as to what their obligations are, where inspections reveal there is a lack of clarity or where inspections reflect that a particular policy is being violated." (County Def. R. 56.1 Stat. ¶ 49)

constant supervision to inmates whose mental health or mental state so require.  As of late, several jurisdictions have inquired whether officers providing such constant supervision must be of the same gender as the inmate."  (Dranoff Aff., Ex. K (Chairman's Mem.))

> The legal opinion explains that
>
> [n]otwithstanding . . . [certain state] statutes permitting the assignment of male and female officers to supervise opposite sex inmates, correctional facilities have been ordered to take appropriate precautions to protect certain privacy interests of inmates while providing equal employment opportunities for male and female correction officers.

(Id.)  The legal opinion then discusses Forts v. Ward, 471 F. Supp. 1095 (S.D.N.Y. 1978), vacated and remanded on other grounds, 621 F.2d 1210 (2d Cir. 1980), and Wolfish v. Levi, 439 F. Supp. 114, 160 (S.D.N.Y. 1977), pointing out that in Forts "the Second Circuit Court of Appeals ruled that female inmates retain certain minimal privacy rights, such as not being viewed by male officers while using the toilet, showering, and dressing, absent exigent circumstances," and that in Wolfish "the District Court required suitable regulations by the Metropolitan Correctional Center to forbid entry into rooms or bathroom facilities by officers of the opposite sex unless there had been sufficient warning or an emergent necessity justif[ying] an exception."[7]  (Id.)

> The legal opinion concludes that because
>
> Title 9 NYCRR § 7003.2(d) requires the "uninterrupted personal visual observation" and the "continuous clear view" of prisoners under constant supervision[,] [i]t is the opinion of Counsel's Office that an officer cannot maintain a continuous clear view of an inmate of the other gender while simultaneously providing the same inmate privacy rights required pursuant to

---

[7]  The legal opinion also cites Hudson v. Goodlander, 494 F. Supp. 890, 894 (D.Md. 1980), stating that it holds that "a male inmate's privacy rights were violated by the assignment of female guards to posts where they could view him while completely unclothed."  (Dranoff Aff., Ex. K (Chairman's Mem.))

Forts.  As such, it is the Commission's position that the constant supervision of an inmate must be performed by an officer of the same gender.[8]

(Id.)

The same-sex observation policy has been enforced by the Commission.  After issuing the Chairman's Memorandum in May 2005, the Commission issued a "Notice of Violation" to the Albany County Correctional Facility because a female inmate under constant supervision had been watched by a male officer while the female officer was on a break. (Dranoff Aff., Ex. W (Sept. 1, 2005 Sheriffs' Ltr.))

## III.   THE SAME-SEX CONSTANT SUPERVISION POLICY IN PRACTICE

Inmates under constant supervision "are housed in cells that differ from ordinary cells in that they have two versus one window and the windows are larger than [those] of ordinary cells."  (County Def. R. 56.1. Stat. ¶ 16)  The toilets in each cell may be observed by the correction officer assigned to constant supervision.[9]  (See, e.g., Dranoff Aff., Ex. F (Russell Dep.) at 29; Ex. G (Conjura Dep.) at 44-45; Ex. I (Hayes Dep.) at 16)  Although some prisoners cover themselves while changing clothing or using the toilet (see id., Ex. F (Russell Dep.) at 34; Ex. G (Conjura Dep.) at 43), others – particularly those suffering from mental disease or illness, drug withdrawal, or delirium tremors – do not.  (Id., Ex. G (Conjura Dep.) at 46)  Because the

---

[8]  The Commission considered alternatives to the same-sex policy, such as half-partitions in cells or having a same-sex officer on call, but concluded that these measures were either impractical or not adequate for security reasons.  (Dranoff Aff., Ex. E (Donegan Dep.) at 39; County Def. R. 56.1 Stat. ¶ 29)

[9]  Captain Conjura explained that "the toilet, depending upon whether it's on the right or the left, is right next to the door.  It's at almost a 45-degree [angle] into the room.  So it protrudes into the room.  The cell is about . . . six and a half feet wide by about eight and a half, maybe nine feet long . . . . But the toilet is at a 45-degree angle to where the door is.  So you can look at the door and you can see the toilet. . . . It juts out into the room.  It's not like tucked off to the side.  So depending upon where the person stands to disrobe to use the bathroom . . . they should be able to be seen by the officer there."  (Dranoff Aff., Ex. G (Conjura Dep.) at 44-45)

constant supervision regulation requires that inmates be observed at all times, correction officers assigned to such duty see inmates in a naked and partially clothed condition.  (Id., Ex. I (Hayes Dep.) at 37-38)

While the parties disagree as to the degree of disruption caused by the same-sex observation policy, there is no dispute that female correction officers at RCCC have at times been removed from their regularly assigned duties – including from positions obtained by competitive bid – in order to temporarily staff constant supervision posts.  (County Def. R. 56.1 Stat. ¶ 58; Pltf. R. 56.1 Stat. ¶ 58)  The experience of individual Plaintiffs has varied.  For example, Plaintiff Tracey testified that she was ordered to work overtime on a constant supervision post only once, and she estimates being removed from her regularly assigned post to work a constant supervision post "[m]aybe five or six times" since November 2002.  (County Def. R. 56.1 Stat. ¶ 73; Dranoff Aff., Ex. H (Tracey-Jackson Dep.) at 86)  In her 2006 deposition, Plaintiff Serrano reported having to work overtime at constant supervision posts twelve times in 2003, but only once since then.  (County Def. R. 56.1 Stat. ¶¶ 104, 106)  Plaintiff Russell testified, however, that she was assigned to a constant supervision post between ten and twenty times in 2005 alone (Dranoff Aff., Ex. F (Russell Dep.) at 20), and Plaintiff Cardillo was removed from her regular post twenty-five times in 2003 and 2004.[10]  (County Def. R. 56.1 Stat. ¶¶ 118-19)

While there is no dispute that male correction officers are also required to work overtime at constant supervision posts (id. ¶ 74), Plaintiffs claim that "the ratio of female to male

---

[10]  A correction officer might be assigned to a constant supervision post for a full 8-hour shift or for as little as one hour.  (See, e.g., County Def. R. 56.1 Stat. ¶¶ 80, 84, 90, 91)

COs . . . further exacerbates an already over-burdened staff."  (Pltf. R. 56.1 Stat. ¶ 57)[11]

Furthermore, female correction officers are reassigned to constant supervision posts when less

senior male officers are on duty, because male officers cannot be assigned to a constant

supervision post involving a female inmate.  (County Def. R. 56.1 Stat. ¶ 59; Dranoff Aff., Ex. F

(Russell Dep.) at 17; Ex. H (Tracey-Jackson Dep.) at 68); Ex. M (Bruso Dep.) at 54)

## IV.   <u>PROCEDURAL HISTORY</u>

This action was filed in March 2004 against the County Defendants.  The

Commission and its then-Chairman (Alan J. Croce) were added as defendants in September

2007.[12]

In the Second Amended Complaint ("SAC"), Plaintiffs allege that the same-sex

constant supervision policy (the "Policy") results in female officers disproportionately being (1)

reassigned to constant supervision from more desirable posts – often obtained through seniority;

(2) forced to work overtime; and (3) "denied . . .  requisite time-off."  (SAC, ¶¶ 16, 18-21)

Plaintiffs claim that prior to implementation of the Policy, job responsibilities and assignments,

overtime, and leave were "predicated exclusively . . . [on] seniority."  (<u>Id.</u> ¶ 15)  The SAC

alleges that the Policy violates Plaintiffs' Fourteenth Amendment rights and seeks, <u>inter alia</u>, an

injunction under Section 1983 barring use of the Policy.  (<u>Id.</u>, Prayer for Relief)

The Commission and its Chairman moved to dismiss the SAC, and on March 25,

2009, this Court granted in part and denied in part their motion. <u>See</u> <u>Corr. Officers Benev. Ass'n</u>

<u>v. Kralik</u>, No. 04 Civ. 2199(PGG), 2009 WL 856395, *1 (S.D.N.Y. Mar. 25, 2009).  The

Commission and its Chairman argued that the Commission had no control over the

---

[11]  The SAC alleges that approximately 122 male officers and only 14 female officers work at
RCCC.  (SAC ¶ 19)

[12]  The case was re-assigned to this Court on October 9, 2008.

implementation of the same-sex policy, that the Commission's recommendation served a rational and legitimate governmental interest, and that both the Commission and its Chairman were immune from suit under the Eleventh Amendment.  This Court granted the Commission's motion to dismiss, and dismissed the damages claims against the Chairman.  However, the Court was unable to determine – at the motion to dismiss stage – whether the Commission's actions were the proximate cause of Plaintiffs' alleged injuries and whether the same-sex policy was substantially related to an important governmental interest.  Accordingly, the Court allowed the claim for injunctive relief against the Chairman, in his official capacity, to proceed.

## DISCUSSION

## I.   LEGAL STANDARD

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  "'[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'"  Watson v. Consol. Edison Co. of N.Y., Inc., 374 F. App'x 159, 161 (2d Cir. 2010) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on

mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create

a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d

159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451,

1456 (2d Cir. 1995)).

## II.   STATUTORY FRAMEWORK

"To state a claim for an equal protection violation, [plaintiffs] must allege that a

government actor intentionally discriminated against them on the basis of race, national origin or

gender." Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999). "Such intentional

discrimination can be demonstrated in several ways. . . . [A] law or policy is discriminatory on

its face if it expressly classifies persons on the basis of race or gender." Id. (citing Adarand

Constructors, Inc. v. Pena, 515 U.S. 200, 213, 227-29 (1995)).

The Policy at issue here "is discriminatory on its face," because it "expressly

classifies persons on the basis of . . . gender." (Id.)  Although it applies to both male and female

correction officers, the Policy on its face requires that only male guards be assigned to male

inmates in need of constant supervision, and that only female guards be assigned to female

inmates needing constant supervision.  Accordingly, the Policy "expressly classifies persons on

the basis of . . . gender." See Hayden, 180 F.3d at 48 ("A statute or policy utilizes a 'racial

classification' when, on its face, it explicitly distinguishes between people on the basis of some

protected category.") (citing Loving v. Virginia, 388 U.S. 1, 11-12 (1967); Wygant v. Jackson

Bd. of Educ., 476 U.S. 267, 282-84 (1986); Adarand Constructors, 515 U.S. at 227)).  To hold

otherwise would be contrary to Loving:  "we reject the notion that the mere 'equal application'

of a statute containing [gender] classifications is enough to remove the classification[] from the

Fourteenth Amendment's proscription of all invidious [gender] discriminations." <u>Loving</u>, 388 U.S. at 8.

"Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." <u>United States v. Virginia</u>, 518 U.S. 515, 531 (1996). "The State must show 'at least that the [challenged] classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives."'" <u>Id.</u> at 533 (quoting <u>Miss. Univ. for Women v. Hogan</u>, 458 U.S. 718, 724 (1982) (quoting <u>Wengler v. Druggists Mut. Ins. Co.</u>, 446 U.S. 142, 150 (1980))). "The justification must be genuine, not hypothesized or invented <u>post</u> <u>hoc</u> in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." <u>Id.</u> (citations omitted). "[S]uch classifications may not be used, as they once were, to create or perpetuate the legal, social, and economic inferiority of women." <u>Id.</u> at 534 (citing <u>Goesaert v. Cleary</u>, 335 U.S. 464, 467 (1948)).

III.    **THE UNION'S SECTION 1983 CLAIM WILL BE DISMISSED BECAUSE IT HAS NOT DEMONSTRATED ARTICLE III STANDING**

Beilein argues that the Union's claim "should be dismissed because it has no standing here to bring civil rights claims pursuant to Section 1983." (Beilein Br. 5) Plaintiffs make no response to this argument, and it appears that the Union has abandoned its claim. (See Pltf. Br. 1 ("the Plaintiffs[] herein, <u>female COs of the RCCC</u> seek declaratory and equitable relief . . . against Defendants . . . alleging a violation of their rights pursuant to 42 U.S.C. § 1983") (emphasis added))

The Second Circuit today issued a decision addressing whether an organization such as the Union can bring an action under Section 1983. <u>Nnebe v. Daus</u>, 09-cv-4305 (2d Cir. Mar. 30, 2011) In <u>Nnebe</u>, the New York Taxi Workers Alliance – along with individual taxi

drivers – brought suit under Section 1983 alleging that drivers who had been arrested were being deprived of their taxi licenses without due process.  The Circuit noted that, "[t]o establish Article III standing, 'a plaintiff must have suffered an "injury in fact" that is "distinct and palpable"; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision.'"  Nnebe, 09-cv-4305, slip op. at 13 (quoting Denney v. Deutsche Bank AG, 443 F.3d 253, 263 (2d Cir. 2006) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  With respect to the standing of an organization to bring a Section 1983 action on behalf of its members, the Court stated:

> [i]t is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983, as we have "interpret[ed] the rights [§ 1983] secures to be personal to those purportedly injured."  League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors, 737 F.2d 155, 160 (2d Cir. 1984) (citing Aguayo v. Richardson, 473 F.2d 1090 (2d Cir. 1974) ("Neither [the] language nor the history [of § 1983] suggests that an organization may sue under the Civil Rights Act for the violations of rights of members")).

Id.  Although "nothing prevents an organization from bringing a § 1983 suit on its own behalf so long as it can independently satisfy the requirements of Article III standing as enumerated in Lujan," id. at 13-14, the Union has not articulated – in either the SAC or its opposition brief – how it as an organization has been injured by the Defendants' allegedly unconstitutional policy. Because the Union has not demonstrated that it has standing to pursue the Section 1983 claim set forth in the SAC, Defendants are entitled to summary judgment as to the Union's Section 1983 claim.

## IV.   THE COUNTY DEFENDANTS ARE NOT LIABLE UNDER MONELL

It is undisputed that – prior to the November 2002 Commission inspection – the RCCC permitted cross-gender constant supervision.  (County Def. R. 56.1. Stat. ¶ 33)  It is likewise undisputed that the County changed its policy in response to directives from the

Commission.  (County Def. R. 56.1 Stat. ¶¶ 39-40; Dranoff Aff., Ex. G (Conjura Dep.) at 53)
The County Defendants argue that "the policy at issue is [thus a] Commission Policy – not a
County policy," and that "the County had no choice in adhering to the Commission Policy."
(County Def. Br. 20)  The County Defendants further argue that because "the County had no
'choice' but to implement the Commission Policy[,] [n]o municipal policy exist[s] . . . upon
which liability under 42 U.S.C. § 1983 c[an] be based."  (Id. at 21)  Plaintiffs argue, however,
that the County was required – in order to avoid liability under Section 1983 – to defy the
Commission's directives and to litigate the constitutionality of those directives in state court.
(Pltf. Br. 30)

      "Local governing bodies . . . can be sued directly under § 1983 for monetary,
declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional
implements or executes a policy statement, ordinance, regulation, or decision officially adopted
and promulgated by that body's officers."  Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658,
690 (1978).  The issue presented here is whether local agencies, such as the County Defendants,
can be held liable under Section 1983 for their implementation of a directive from a State entity
such as the Commission.  The Second Circuit addressed this issue in Vives v. City of New York,
524 F.3d 346 (2d Cir. 2008).

      In Vives, the court considered a Section 1983 action in which the plaintiff alleged
that the City of New York's enforcement of a New York State Penal Law statute violated the
First and Fourth Amendments.  The City moved for judgment on the pleadings, contending that
the plaintiff "could not establish that any City policy caused him harm because [the Penal Law
statute] was enacted by the state legislature."  Vives, 524 F.3d at 348-49.

In considering the City's argument, the Second Circuit noted that "'[t]he word "policy" [– as used in <u>Monell</u> –] generally implies a course of action consciously chosen from among various alternatives.'"  <u>Vives</u>, 524 F.3d at 350 (quoting <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823 (1985)).  Accordingly, where a state law mandates enforcement by local authorities, "a municipality's decision to honor this obligation is not a conscious <u>choice</u>.  As a result, the municipality cannot be liable under <u>Monell</u>. . . ."  <u>Id.</u> at 353 (emphasis in original).  "On the other hand, if a municipality decides to enforce a statute that it is authorized, but not required, to enforce, it may have created a municipal policy."  <u>Id.</u>

Here, there is no dispute that the County Defendants consciously implemented the same-sex constant supervision policy.  The Court finds that in implementing the Policy, however, the County Defendants had no choice – their course of action was mandated by the Commission.  Accordingly, the County Defendants cannot be liable under <u>Monell</u>.  <u>Id.</u>

The Commission's directives to the RCCC were clear and repeated:  same-sex constant supervision is prohibited.  (County Def. R. 56.1. Stat. ¶¶ 35-36, 48; Dranoff Aff., Ex. R (Nov. 22, 2002 Commission Ltr. to RCCC), Ex. K (Chairman's Mem.))  The Commission likewise made clear that it would enforce that policy, and the evidence shows that it did in fact take enforcement action against the Albany County Correctional Facility.  (Dranoff Aff., Ex. W (Sept. 1, 2005 Sheriff's Ltr.); Ex. E (Donegan Dep.) at 18-20, 37-39)  Had the County Defendants chosen to defy the Commission's directives, the Commission – under its statutory authority – could have "appl[ied] to the supreme court [of the State of New York] for an order . . . requiring compliance."  N.Y. Correction Law § 46(4).  The Commission also has the power to close prison facilities that do not comply with its rules and regulations.  <u>See</u> N.Y. Correction Law § 45(8)(a).

Under these circumstances, this Court concludes that the County Defendants did not have "a meaningful choice as to whether [they] would enforce" the same-sex constant supervision policy.  Accordingly, the County Defendants cannot be held liable under <u>Monell</u>, and their motion for summary judgment will be granted.

## V.  **BEILEIN'S MOTION FOR SUMMARY JUDGMENT WILL BE GRANTED**

Beilein argues that he is entitled to summary judgment because (1) the Commission does not control or directly administer the RCCC, and therefore it is not responsible for the same-sex constant supervision policy; and (2) the Policy is "substantially related to an important governmental interest . . . , specifically inmate privacy rights, in light of the court decisions on the topic."  (Beilein Br. 4, 7)  Consistent with the ruling stated above, this Court concludes that the Commission is in fact responsible for the County Defendants' same-sex constant supervision policy.  The Court further concludes, however, that the Policy "'serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives."'"  <u>United States v. Virginia</u>, 518 U.S. at 533 (quoting <u>Miss. Univ. for Women</u>, 458 U.S. at 724 (quoting <u>Wengler</u>, 446 U.S. at 150)).

### A.    **The Commission is Responsible for the County's Same-Sex Policy**

Beilein argues that "the Commission is akin to a 'state watchdog agency' and has no 'direct power to control or direct' facilities."  (Beilein Br. 2 (quoting <u>Brody v. McMahon</u>, 684 F. Supp. 354, 356-57 (N.D.N.Y. 1988)))  Because the Commission did not "implement[] the recommendation at issue at Rockland County Jail," Beilein argues that Plaintiffs' claim against him must be dismissed.  (<u>Id.</u> at 4)

Here, the Commission's conduct amounts to much more than a "recommendation." The Commission formulated a policy, instructed correctional facilities that they must comply, and enforced the policy when a correctional facility failed to comply. At RCCC, the Commission exercised its supervisory authority in connection with the Policy directly and explicitly. The County Defendants were instructed that their cross-gender constant supervision practices violated the Commission's policy and applicable law, and the County Defendants were directed to bring their practices into compliance. The County Defendants immediately issued a revised policy consistent with the Commission's directive. The Commission later repeatedly confirmed that directive. Under these circumstances, Plaintiffs have adequately demonstrated that the Commission is directly responsible for the same-sex constant supervision policy at issue. See Brody, 684 F. Supp. at 356.

### B.    Legal Precedent Acknowledging Inmates' Privacy Rights

The Commission advised the correctional facilities under its supervision that federal law requires a same-sex constant supervision policy:

> It is the opinion of Counsel's Office that an officer cannot maintain a continuous clear view of an inmate of the other gender while simultaneously providing the same inmate privacy rights required pursuant to Forts [v. Ward, 471 F. Supp. 1095 (S.D.N.Y. 1978)]. As such, it is the Commission's position that the constant supervision of an inmate must be performed by an officer of the same gender.

(Dranoff Aff., Ex. K (Chairman's Mem.))

In Forts, the district court considered how best to "make an accommodation as between two substantial principles: (1) the right of a prison inmate to some minimum of privacy; and (2) the right of equal job opportunity regardless of sex." Forts, 471 F. Supp. at 1098. To comply with Title VII, New York State altered its guidelines in 1976 to permit any qualified applicant, regardless of sex, to serve as a guard in inmate living and sleeping quarters. Id. at

1096.  Soon thereafter, inmates at Bedford Hills Correctional Facility, a state prison for women, filed suit seeking to enjoin male correction officers from working in locations where they could observe female inmates changing or in the nude.  Id. at 1097.

The court recognized that an inmate's right to privacy is limited:  "an individual's normal right of privacy must necessarily be abridged upon incarceration in the interest of security of the institution," and "the normal right to close the front door of one's home and be free from observing eyes must give way to the need for a guard to look within."  Id. at 1098.  The court also found, however, that "it is an invasion of a female inmate's right of privacy for her to be viewed by a male guard while she is using the toilet even if he is acting in the normal course of his duties."  Id.

The court concluded that "equal job opportunity must in some measure give way to the right of privacy":

> [I]t is neither penologically required nor permissible (1) that during the day an inmate be in a situation where a) she may be or must risk being viewed completely or partly in the nude by a male guard in the course of his duties or b) she may be observed while using the toilet; (2) that during the night she be observed rising from sleep to use the toilet, or suffer herself to be observed perhaps numerous times during sleep in whatever may be her disarray of bed clothes . . . ; (3) that her head be directly observable by a male guard while she is taking a shower; (4) that a male guard in the prison hospital be so stationed as to permit him under normal circumstances to view an inmate wholly or partially unclothed.

Id. at 1099-1100.

The Forts court found that some of the prison's current policies provided the necessary privacy.  For example, prisoners were permitted to cover the window to their cells for up to 15 minutes at a time during daytime hours "for complete privacy while changing clothes or using the toilet."  Id. at 1100.  The court found that "[t]his adequately protects [inmates'] privacy, and during the daytime shifts there is no reason that guards may not be assigned to the

housing unit corridors regardless of sex."  Id.  However, the court concluded that it was

"inappropriate for a male guard to be making the first count of the morning with the inmates just

awakened and their doors locked open," or for male guards to be "look[ing] into or shin[ing] a

flashlight into [an inmate's] cell without warning [during the night] to see if she is there, without

any advance awareness of whether she is using the toilet or, if sleeping, her body is revealed

because her bedding or night garments are disarrayed or cast aside."  Id. at 1100-01.  "[T]he risk

of at least embarrassment or shame or humiliation from actual or potential viewing during the

night by males whose duty it is to watch her" led the court to "conclude that it is a violation of

the inmate's right of privacy to have male guards assigned to such duties during the night."  Id. at

1101.  The district judge crafted a series of facility and work assignment rules designed to

safeguard the inmates' privacy rights while protecting the correction officers' right to equal

employment opportunity.

On appeal, the Second Circuit found that "[i]n most respects [the district court]

skillfully avoided an ultimate conflict between employment and privacy rights by carefully

tailored adjustments to either facilities or work assignments."  Forts v. Ward, 621 F.2d 1210,

1216 (2d Cir. 1980).  While upholding most of the district court's order concerning facility and

work assignments, however, the Circuit found that "the remedy adopted to protect the privacy of

the inmates in their cells during nighttime hours ha[d] placed privacy and employment rights in

direct conflict and resulted in a denial of equal employment opportunities for the male guards

and, as a consequence of their reassignment, for the female guards as well."  Id.  The court saw

two possible solutions to the conflict:  "remove the men or obstruct their view."  Id.  Because the

prison was willing to issue appropriate pajamas to each inmate and "to permit inmates to cover

their cell door windows at night for the same fifteen-minute intervals permitted during the

daytime," <u>id.</u> at 1214, the court overruled that part of the district court's opinion that prohibited

"assignment of male guards to the nighttime shifts in dormitories," and remanded "for further

proceedings to revise the order with appropriate means to eliminate the opportunities for viewing

that have been found to impair the privacy rights of the inmates."  <u>Id.</u> at 1217.

      The Second Circuit made clear that it

> [did] not minimize in any way the significance of the privacy interests of the
> inmates that the District Court has sought to protect.  We do not elevate the
> employment rights of the guards above any protect[a]ble privacy rights of the
> inmates.  We simply conclude that in the circumstances of this case the remedy
> proposed by the State will accord adequate protection to the privacy interests of
> the inmates by means that will avoid any denial of the guards' rights to equal
> employment opportunities.  Since that is so, it is important for the employment
> opportunities of both sexes that the portion of the District Court's remedy
> requiring unjustified gender-based discrimination be set aside.

<u>Id.</u>

      In <u>United States ex rel. Wolfish v. Levi</u>, 439 F. Supp. 114, 160 (S.D.N.Y. 1977),

<u>rev'd in part on other grounds</u>, 573 F.2d 118 (2d Cir. 1978), <u>rev'd in part on other grounds sub</u>

<u>nom</u>, <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979), another court in this District reiterated that

"[s]uitable regulations . . . must forbid entry into rooms or bathroom facilities by officers of the

opposite sex unless (a) there has been sufficient warning or (b) emergent necessity justifies an

exception."  <u>Id.</u>

      More recent cases in this Circuit and elsewhere addressing inmates' right to

privacy suggest that occasional, indirect, or brief viewing of a naked prisoner by a guard of the

opposite sex may be permissible,[13] but that "regular and close viewing" is prohibited.[14]

---

[13]  <u>See, e.g.</u>, <u>Sattler v. Foster</u>, No. 01-35733, 37 Fed. App'x 311, 312 (9th Cir. 2002)
("Occasional viewing of male prisoners by female correctional officers does not violate the
Fourth Amendment right to privacy or the Eighth Amendment prohibition against cruel and
unusual punishment."); <u>Kuntz v. Wilson</u>, No. 94-35221, 33 F.3d 59 (table), 1994 WL 417424, at
*1 (9th Cir. Aug. 19, 1994) ("Prisoners have only a very limited right of bodily privacy from

C.     **"Exceedingly Persuasive Justification" Exists for the Policy**

Here, the Court concludes that Defendants have demonstrated "exceedingly persuasive justification" for the same-sex constant supervision policy.  In order to prevent suicidal and other mentally impaired inmates from doing harm to themselves, it is obvious that the constant supervision policy serves an important governmental interest.  Defendants have demonstrated that that interest cannot be properly served absent correction officers' ability to have an unobstructed view of such inmates at all times.  Given the case law in this Circuit and elsewhere indicating that "regular and close viewing" of a prisoner, by a guard of the opposite sex, while that inmate is undressed, undressing, or engaged in intimate bodily functions violates inmates' right to privacy, the same-sex constant supervision policy "'serves "important governmental objectives and . . . the discriminatory means employed" are "substantially related to the achievement of those objectives."'"  Id. at 533 (quoting Miss. Univ. for Women, 458 U.S. at 724).

---

guards of the opposite sex. . . . The assignment of female prison guards to positions requiring only infrequent and casual observation of naked male prisoners does not violate the prisoners' right to privacy."); Thomas v. Shields, No. 92-6678, 981 F.2d 1252 (table), 1992 WL 369506, at *1 (4th Cir. Sept. 15, 1992) (male plaintiff's "right to privacy was not violated by the occasional, inadvertent encounter with female guards" who observed him in shower and on toilet); Michenfelder v. Sumner, 860 F.2d 328, 334 (9th Cir. 1988) ("Our circuit's law respects an incarcerated prisoner's right to bodily privacy, but has found that assigned positions of female guards that require only infrequent and casual observation, or observation at a distance, and that are reasonably related to prison needs are not so degrading as to warrant court interference.").

[14] See, e.g., Baker v. Welch, No. 03Civ.2267(JSR)(AJP), 2003 WL 22901051, *20 (S.D.N.Y. Dec. 10, 2003) (male parolee complained that a female parole officer watched him provide a urine sample; "the balance should be struck to allow incidental . . . viewing but prohibit regular . . . viewing."); Miles v. Bell, 621 F. Supp. 51, 67 (D. Conn. 1985) ("Those cases which have found a violation of inmates' rights to privacy have looked to the frequency or regularity of such 'viewing.'  As a general rule, courts have found a violation only in those cases in which guards regularly watch inmates of the opposite sex who are engaged in personal activities, such as undressing, using toilet facilities or showering. . . . The Court finds that Forts v. Ward merely emphasizes that in order for inmates to show a violation of their privacy rights, they must show that the 'viewing' by guards of the opposite sex occurs on a regular basis.").

The Second Circuit has been careful not to "elevate the employment rights of the guards above any protect[a]ble privacy rights of the inmates," and in <u>Forts</u> the Circuit overruled the district court only to the extent that reasonable alternatives to a same-sex policy were available, such as allowing inmates to briefly cover their cell windows at night.  621 F.2d at 1217.  In that case, "the remedy proposed by the State [would] accord adequate protection to the privacy interests of the inmates by means that [would] avoid any denial of the guards' rights to equal employment opportunities."  <u>Id.</u>  Here, no such alternative to the same-sex policy exists. Inmate security cannot be ensured absent clear, unobstructed view, and observation must be conducted at all times.  <u>See</u> 9 NYCRR § 7003.2(d) (requiring "the uninterrupted [and unobstructed] personal visual observation of prisoners by facility staff").

## CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment are GRANTED.  The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 43, 50) and to close this case.

Dated: New York, New York
       March 30, 2011

SO ORDERED.

Paul G. Gardephe
United States District Judge